**Ann K. THOMPSON, Plaintiff,**

v.

**KN ENERGY, INC., Defendant.**

**No. 99–4115–DES.**

United States District Court,
D. Kansas.

Dec. 13, 2001.

James E. Benfer, David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Plaintiff.

Eric B. Metz, Jerald W. Rogers, Triplett, Woolf & Garretson, LLC, Wichita, KS, for Defendant.

## *MEMORANDUM AND ORDER*

SAFFELS, District Judge.

This matter is before the court on defendant's Motion for Summary Judgment (Doc. 87). Plaintiff has filed a Response (Doc. 98), and defendant has filed a Reply (Doc. 100). In this employment discrimination/termination case, plaintiff brings multiple claims under federal and state law. For the reasons discussed below, defendant's motion is granted in part and denied in part.

## I. BACKGROUND

### A. Factual History

The following facts concerning plaintiff's claims are either uncontroverted or, if controverted, are construed in a light most favorable to plaintiff.

On April 1, 1997, defendant acquired the Bushton, Kansas, Gas Gathering and Processing Plant ("Bushton") from the previous owner/operator, Enron Corporation ("Enron"). Bushton is one of the largest natural gas processing facilities in North America. The facility contains both extraction and natural gas liquids ("NGL") fractionation units as well as a large underground NGL storage facility. Relevant to this matter, Bushton's physical assets include a building known as RTU–8. The structure houses temperature-sensitive electronic monitoring equipment.

Plaintiff was hired by Enron in November of 1990, and she continued to work at Bushton after the facility was acquired by defendant. The record before the court is unclear as to exactly where plaintiff worked in Bushton while the facility was owned by Enron. It appears that during this time plaintiff worked in multiple areas of the facility, including the NGL storage field and hydrocarbon extraction plant. It is uncontroverted, however, that in August of 1997, plaintiff was transferred to work exclusively in the storage field. Throughout her tenure at Bushton, plaintiff's job title was "plant operator."[1] As an operator, plaintiff was responsible for the operation of compressors, engines, auxiliary units, turbines, motors, cooling equipment, pumps, and related processing equipment. The job also required plaintiff to take samples and perform tests to monitor Bushton's on-going operations.

### 1. Plaintiff's Work Related Injury

On July 5, 1996, while still employed by Enron, plaintiff sustained an on-the-job injury to her left elbow. Plaintiff was apparently using a wrench to adjust a pipe when the wrench swung and contacted plaintiff's left elbow. The submitted medical evidence shows plaintiff suffered a radial head fracture and an ulnar nerve injury. The accident, however, did not require plaintiff to miss any work. Plaintiff subsequently filed a workers' compensation

---

**1.** The evidence before the court reveals plaintiff was seeking or had achieved a promotion to "operator II" status. The parties' filings are unclear as to the differentiation between the two positions.

claim with respect to the July 5, 1996, injury. This workers' compensation claim is the only claim plaintiff filed, which is relevant to the presently pending action. The workers' compensation claim was subsequently settled in July of 1997.

## 2. Events Preceding Plaintiff's Termination

On October 26, 1997, plaintiff was scheduled to work the 5:30 a.m. to 5:30 p.m. "daylight" shift. The weather conditions were poor; some sleet or snow was falling. Plaintiff was joined by her coworkers Chris Montoya ("Montoya") and Bill Wilder ("Wilder") on the daylight shift.

Shortly after arriving for work, Montoya started a Ford pick-up truck in order to warm it up and thaw the ice off the windshield so it could be used by plaintiff. It is unknown whether any other employees had driven the truck during the preceding night shift. It is also uncontroverted that additional employees had access to the truck during the daylight shift. In any event, plaintiff began operating the truck at 5:45 a.m.

According to Wilder's deposition, between approximately 6:20 a.m. and 7:00 a.m., he witnessed plaintiff drive the truck near the RTU–8 building and enter the building. After exiting and reentering the truck, the truck pulled forward and then stopped. Plaintiff walked to the front of the truck, then got back into the truck, backed-up, and drove away. At some point in the day, Montoya observed damage to the front bumper of the truck and asked plaintiff and Wilder what had happened to the truck. At approximately 5:00 p.m., Wilder was walking in the vicinity of building RTU–8. He heard something that sounded like a gas leak, and upon investigation, discovered a two-inch gas riser was cracked and blowing fuel gas. Temporary measures were immediately undertaken to stop the leak and secure the area. It is uncontroverted that the fuel leak represented a serious danger to property and human life.

### 3. Defendant's Investigation

Defendant's "Incident Investigation Team" began its investigation of the gas riser leak the following day. The investigation revealed that tire tracks led up to the cracked gas riser and the marks on the bumper of the truck matched the impact damage on the fuel line and pipe guard. Plaintiff, Montoya, and Wilder were interviewed regarding the incident. During these interviews, plaintiff denied any knowledge of the leak. Plaintiff did indicate she had some trouble with her original gloves, and upon returning to the truck to gather a pair of lighter gloves she may have "bumped" the gear shifter and accidently slipped the truck into neutral. In this position, according to plaintiff, it was possible for the wind to blow the truck forward.

On November 3, 1997, plaintiff was suspended with pay pending the remainder of the investigation. Plaintiff was later discharged on November 13, 1997. According to defendant, plaintiff was discharged because it was determined she was responsible for the gas riser leak and failed to report the incident. It is uncontroverted plaintiff was aware company policy required reporting of accidents and a failure to report, where safety was at issue, could lead to termination of employment. Plaintiff was informed she could appeal her discharge.

Plaintiff subsequently completed and filed a "Complaint of Involuntary Termination" with defendant on December 5, 1997. In response to plaintiff's complaint and request for second-level review, a new fact-finding investigation was overseen by defendant's General Operations Manager, Pierce Norton. The second investigation

found plaintiff's discharge was appropriate. Plaintiff opted to pursue the third step of the internal appeals process. During this phase, Christine Arthun from defendant's Environmental and Safety Department conducted a safety investigation with respect to the gas riser incident. This third investigation occurred at Bushton in April of 1998. At the end of the third level of review, it was determined by Michael Crisman, Vice President of Operations, that plaintiff's dismissal was appropriate.

### B. Plaintiff's Claims

The Pretrial Order (Doc. 85) reveals plaintiff brings five claims against defendant: (1) failure to accommodate claim pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* (2) retaliation claim also pursuant to the ADA; (3) sexual harassment/hostile work environment claim pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.;* (4) disparate treatment/discriminatory discharge claim also pursuant to Title VII; and (5) state law workers' compensation retaliation claim.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant.

*Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir. 1993). The movant may discharge its burden "by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. 2548. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (interpreting Fed. R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. 2548. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. 2548.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) ("The

court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues."). The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. 2505.

## III. DISCUSSION

### A. ADA Claims

Plaintiff brings two claims under the ADA. First, plaintiff alleges defendant intentionally discriminated against her by failing to provide reasonable accommodation for her work restrictions as necessitated by her disability. Second, plaintiff alleges defendant terminated her in retaliation for her requests for accommodation of her work restrictions.

#### 1. Discrimination–Failure to Accommodate

The ADA prohibits a covered entity form discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). The ADA defines the term "discriminate" to include "not making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual ...." 42 U.S.C. § 12112(b)(5)(A) (emphasis added). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). *See, e.g., Sutton v. United Air Lines, Inc.,* 130 F.3d 893, 897 (10th Cir.1997); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1123 (10th Cir.1995).

Although somewhat convoluted, it appears plaintiff claims defendant should have transferred plaintiff from her position as plant operator in the storage field to a position consisting of only "office work." (Pretrial Order at 4). It is uncontroverted that plaintiff's work duties in the storage field were not analogous with "office work." Plaintiff does not, however, suggest any accommodations, which could have been taken to alter her duties in the storage field so that her work was in compliance with an "office work" only restriction. The court, therefore, interprets plaintiff's claim as falling under the ADA's reassignment analytical framework.

#### a. Summary Judgment Framework

In *Smith v. Midland Brake, Inc.,* 180 F.3d 1154 (10th Cir.1999) (en banc), the Tenth Circuit specifically outlined the burdens a putative ADA plaintiff seeking reassignment must satisfy to survive summary judgment. The circuit court advocated the use of a modified burden-shifting paradigm based on the traditional framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Smith,* 180 F.3d at 1178–79. Under this approach, the plaintiff must first make an initial showing of a prima facie case. In the reassignment context, a prima facie case consists of the following five elements:

(1) The employee is a disabled person within the meaning of the ADA and has made any resulting limitations from his or her disability known to the employer;

(2) The preferred option of accommodation within the employee's existing job cannot reasonably be accomplished;

(3) The employee requested the employer reasonably to accommodate his or her disability by reassignment to a vacant position, which the employee may identify at the outset or which the employee may request the employer identify through an interactive process, in which the employee in good faith was willing to, or did, cooperate;

(4) The employee was qualified, with or without reasonable accommodation, to perform one or more appropriate vacant jobs within the company that the employee must, at the time of the summary judgment proceeding, specifically identify and show were available within the company at or about the time the request for reassignment was made; and

(5) The employee suffered injury because the employer did not offer to reassign the employee to any appropriate vacant position.

*Id.* at 1179.

 Once the plaintiff produces sufficient evidence to establish a prima facie case, the burden of production shifts to the defendant-employer to produce evidence either "(1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense . . . ." *Id.* If the defendant-employer is successful, summary judgment will be granted in its favor unless the plaintiff can establish a genuine dispute regarding either the prima facie elements or the defendant-employer's affirmative defense. *Id.* In the present case, defendant argues plaintiff has failed to demonstrate several elements of her prima facie case.

**b. Element One: Plaintiff's Disability**

Under the ADA, a person is considered to have a disability if that individual either (A) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (B) has a record of such an impairment, or (C) is regarded by the employer as having such an impairment. 42 U.S.C. § 12102(2). Plaintiff presents arguments under all three subsections, so the court will address each in turn.

**i. Limitation of Major Life Activities**

 There exists a three-step process for determining whether a plaintiff has a disability under the major life activities subsection of the ADA's disability definition. *See Bragdon v. Abbott,* 524 U.S. 624, 631–41, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). First, the court must determine if plaintiff suffers from a physical or mental impairment. *Id.* Plaintiff's elbow injury is clearly a physical impairment affecting her musculoskeletal system. *See* 29 C.F.R. § 1630.2(h)(1). Defendant concedes this point. The second step in the analysis is to identify those life activities affected by the impairment and determine whether they are "major" life activities under the ADA. *Bragdon,* 524 U.S. at 631–41, 118 S.Ct. 2196. Plaintiff claims she is limited in the life activities of lifting, working, and performing manual activities. Defendant does not contest that these life activities are "major" life activities under the ADA.[2] The third and final step in the process inquires into whether plaintiff's impairment "substantially limits" the major life activities identified in step two. *Id.* Defendant claims plaintiff has failed to demon-

---

**2.** Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, working, sitting, standing, lifting, and reaching. *See* 29 C.F.R. Pt. 1630, App. 1630.2(i).

*See also Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1173 (10th Cir.1996) (identifying working and lifting as major life activities under the ADA).

strate that her impairment substantially limits any of her identified major life activities.

The Equal Employment Opportunity Commission's ("EEOC") regulations implementing the ADA define the term "substantially limits" to mean:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The regulations recommend that the following factors be considered in determining whether an individual is substantially limited in a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

### aa. Lifting

■ As to plaintiff's claim of significantly restricted lifting ability, there exists a large body of case law suggesting plaintiff would not be disabled under the ADA. The medical evidence before the court concerning plaintiff's lifting restriction is limited. In fact, plaintiff has offered no medical evidence detailing her ability to lift. On the other hand, defendant provides the court with records of plaintiff's medical examinations as performed by J. Mark Melhorn, M.D. Dr. Melhorn opines plaintiff has a thirty-five pound maximum

lifting restriction due to her left elbow injury.[3] (Melhorn Aff. Ex. B). Several circuits, including the Tenth Circuit, have found more severe lifting restrictions to be insufficient for inclusion under the ADA. *See, e.g., Huckans v. United States Postal Serv.*, 201 F.3d 448 (10th Cir.1999) (table) (finding thirty-five pound lifting restriction not substantially limiting); *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 539–40 (9th Cir.1997) (finding restriction from lifting more than twenty-five pounds not substantially limiting); *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir.1996) (same), *cert. denied*, 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997), *abrogated on other grounds by Baird v. Rose*, 192 F.3d 462, 469 n. 8 (4th Cir.1999); *Aucutt v. Six Flags Over Mid–America, Inc.*, 85 F.3d 1311, 1319 (8th Cir.1996) (same); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (individual with impaired arm who could not do heavy lifting or repetitive rotational movements and who had difficulty picking things up from the floor and holding things up high was not disabled); *Barnard v. ADM Milling Co.*, 987 F.Supp. 1337, 1342 (D.Kan.1997) (finding a forty-two pound restriction not substantially limiting). *Cf. Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1174 (10th Cir. 1996) (finding plaintiff with multiple sclerosis who could not lift items over fifteen pounds and only could lift items weighing less than fifteen pounds occasionally presented genuine issue of material fact concerning her lifting ability).

Plaintiff offers no response to this suggestive case law. Instead, plaintiff only directs the court to plaintiff's limitation in her ability to work. The court will address the work issue in its subsequent

---

**3.** Dr. Melhorn also opines plaintiff is generally restricted to "light medium" work and suffers from a twelve percent permanent partial impairment of the left arm. (Melhorn Aff. Ex. B).

discussion, yet to the issue of lifting, plaintiff's argument is unpersuasive. In light of plaintiff's relatively high lifting restriction, the court is convinced plaintiff has not sufficiently demonstrated she is disabled under the ADA in regards to her limited lifting ability.

### bb. Working

When evaluating whether a plaintiff's impairment significantly restricts his/her life activity of working, the EEOC regulations include three additional factors that may be considered:

(A) [t]he geographical area to which the individual has reasonable access;

(B) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii).

■ In *Bolton v. Scrivner, Inc.,* 36 F.3d 939 (10th Cir.1994), *cert. denied,* 513 U.S. 1152, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995), the Tenth Circuit noted that the mere existence of physical restrictions, particularly those relating to manual labor, do not necessarily by themselves establish that an individual is substantially limited in the major life activity of working. Instead, an ADA plaintiff must "produce evidence showing a significant restriction in his 'ability to perform either a class of jobs

or a broad range of jobs in various classes ....'" *Bolton,* 36 F.3d at 943 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

In an attempt to satisfy this burden, plaintiff directs the court's attention to an Enron document attached to defendant's memorandum. (Def. Mem. in Supp. Ex. 3). The document, dated December 4, 1996, is entitled "Certification of Physician." The two-page, fill in the blank form, was completed by Dr. Jeryl G. Fullen.[4] The relationship between plaintiff and Dr. Fullen is left unexplained by the parties. It appears, however, Dr. Fullen was plaintiff's primary physician immediately following her elbow injury.

The form asks multiple questions of the completing physician regarding the health and work restrictions of the employee in question. Relevant to the current inquiry, Dr. Fullen indicates: (1) plaintiff is unable to perform the essential functions of her job; (2) plaintiff should not pull or push with her left arm; and (3) plaintiff may return to "office work" without physical restrictions. The document is somewhat confusing in that Dr. Fullen opines plaintiff will be able to return to work on November 21, 1996, approximately a week and a half *before* the doctor completed the form.

■ Apparently referring to this document, plaintiff makes the following argument: "From a period of December 4, 1996 until she was fired, [plaintiff] was restricted to office work. Therefore, plaintiff submits that such restriction was a substantial limitation in her ability to work." (Pl. Mem. in Opp'n at 74). As interpreted by the court, plaintiff supposes that because the form indicates she could not work her present job, or in the ADA vernacular, she was disqualified from the storage field job, she is substantially limit-

---

4. No indication is given as to which medical degree Dr. Fullen holds.

ed in her ability to work. The court rejects plaintiff's assertion.

First, without question, plaintiff's elbow injury did not disqualify plaintiff from her position with defendant. (Pl. Dep. at 18–19). In fact, plaintiff worked for over a year, without missing a single day of work, in both the hydrocarbon facility and storage field after her injury. The fact plaintiff continued to perform the same work duties after her injury seriously compromises her position that she is substantially limited in her ability to work.[5] *See Selenke v. Medical Imaging*, 248 F.3d 1249, 1257 (10th Cir.2001) (finding plaintiff not significantly restricted in her ability to work either a class of jobs or a broad range of jobs in various classes in part because plaintiff acknowledged her ability to perform her work duties prior to termination). In reaching this conclusion, the court has looked beyond the classification of plaintiff's impairment and examined the effect the impairment had on her ability to function. *See* 29 C.F.R. Pt. 1630, App. 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

In the alternative, assuming, *arguendo*, plaintiff was indeed disqualified from her work as a plant operator in the storage field, such a showing, standing alone, does not necessitate a finding of disability. *See Welsh v. City of Tulsa*, 977 F.2d 1415, 1417 (10th Cir.1992) (while working is a major life activity, it does not include necessarily "working at the job of one's choice"). Instead, plaintiff must demonstrate she is significantly restricted from working either a class of jobs or a broad range of jobs in various classes. Plaintiff has failed to make the necessary showing. *See Bolton*, 36 F.3d at 943–44. Plaintiff could have met this burden by addressing her "vocational training, the geographical area to which [s]he has access, or the number and type of jobs demanding similar training from which [plaintiff] would also be disqualified." *Id.* at 944. One district court stated the burden as follows:

> Thus, the imposition of a lifting restriction, ... *or even a designation such as light or medium duty*, is not sufficient to establish the existence of a disability ... a plaintiff must go further, offering evidence that these restrictions, in light of his training, skills, vocational opportunities, geographic limitations and the like, significantly impede his ability to find a job.

*Matthews v. TCI of Illinois*, No. 95 C 4096, 1996 WL 332693, at *3 (N.D. Ill. June 14, 1996) (emphasis added).

Plaintiff, however, has presented no evidence whatsoever indicating her inability to secure employment. The only evidence before the court indicates plaintiff successfully secured employment as an administrative assistant after her termination. (Pl. Dep. at 211). Plaintiff's impairment

---

5. Plaintiff's deposition does reveal she endured increased pain in her left elbow while working in the storage field: "Just that when I'd go home at night it would, it would swell on many occasions and it had not been doing that in the hydrocarbon plant. I had lots more pain, took lots more Alleve." (Pl. Dep. at 29). There is, however, no indication plaintiff was physically unable to perform her work duties. To this end, plaintiff testified as follows:

Question: Do you believe that you could perform the job of the storage field?

Answer: Yes, because I was doing it.

(*Id.* at 102). While plaintiff may contend her work duties in the hydrocarbon were less physically demanding, a point controverted by defendant, she never asserts the work was synonymous with "office work."

appears, at best, to only restrict her from a narrow range of jobs that require repetitive lifting over thirty-five pounds. *See, e.g., Schneider v. Chas Seligman Distrib. Co.,* 995 F.Supp. 756, 760 (E.D.Ky.1998) (finding plaintiff with thirty pound lifting restriction and a ten percent whole body impairment restricted only from a narrow range of jobs).

In sum, plaintiff's impairment has not substantially limited her ability to work. She maintained her employment with defendant and has been employed after her termination. Without hesitation, the court finds she is not disabled due to any limitation of her life activity of working.

### cc. Manual Tasks

■ The insufficiency of plaintiff's evidence reaches its crescendo when she asserts she is significantly restricted in her ability to perform manual tasks. When asked in her deposition what physical activities she can not now perform due to her elbow injury, plaintiff responded: "Water-skiing ... [s]now skiing, mowing the lawn, carrying laundry baskets with wet clothes, picking up my grandchildren. And, and a lot of things I do are, you know, I can feel aggravation in it. It doesn't prevent me from doing them, but they are aggravated by it." (Pl. Dep. at 198). Plaintiff went on to clarify that she can still mow the lawn and water-ski, but she has to push the mower primarily with her right hand and while water-skiing she tires more quickly. (*Id.* at 198–99). As for picking up her grandchildren, she states that before her injury she was able to pick up two children at once. (*Id.* at 200). The court finds such adaptive behavior falls woefully short of demonstrating plaintiff is disabled due to her limitations in performing manual tasks. The court is bewildered by plaintiff's assertion that shortened ski runs qualifies as a limitation, which places her under the protective umbrella of the ADA. In any event, the court finds plaintiff has

failed to sufficiently demonstrate she is substantially limited in her ability to perform manual tasks.

### ii. Record of Impairment

Even though plaintiff has failed to show that any of her identified major life activities are substantially limited, the ADA's definition of "disability" may be satisfied by "a record" of an impairment that substantially limits one or more life activities. 42 U.S.C. § 12102(2)(B). "The intent of this provision, in part, is to ensure that people are not discriminated against because of a history of disability." 29 C.F.R. Pt. 1630, App. 1630.2(k). To satisfy this section, plaintiff must establish that at some point in time her impairment actually did substantially limit one of her identified major life activities. *McKenzie v. Dovala,* 242 F.3d 967, 972 (10th Cir.2001).

Plaintiff has presented the court with no evidence or argument regarding her historical ability to lift or perform manual tasks. Plaintiff does insist, relying once again on the Enron document, that her ability to work was substantially limited from December 4, 1996, till her termination in November of 1997. However, in light of plaintiff's direct testimony indicating she was able to perform her work duties throughout her tenure with defendant (and was indeed performing said duties up to the date of her termination), the court rejects plaintiff's assertion that she possesses a record of disability. *See Sorensen v. University of Utah Hosp.,* 194 F.3d 1084, 1087 (10th Cir.1999) (requiring plaintiff under the "record of impairment" prong to demonstrate that at some point her impairment substantially limited a major life activity).

### iii. Regarded As Disabled

■ In the alternative, plaintiff contends she is disabled under the ADA because defendant regarded her as having an

impairment that substantially limits one or more of her major life activities. 42 U.S.C. § 12102(2)(C). The Supreme Court has held that to be "regarded as disabled," a plaintiff must show "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In other words, even if plaintiff is not actually disabled, she is "disabled" under the ADA if defendant perceived her as such.

■ The court finds plaintiff has offered no evidence sufficiently demonstrating any mistake on the part of defendant in regards to plaintiff's impairment. At best, plaintiff offers the following in her memorandum: "Throughout their testimony, defendant's management refers to [plaintiff]'s disability. There is also substantial evidence of defendant's view of [plaintiff]'s disability, to the extent that defendant considered removing her completely from work." (Pl. Mem. in Opp'n at 76). Unfortunately, plaintiff fails to cite to any specific testimony within the record. Without question, such unsubstantiated conclusory allegations fail to raise a genuine issue as to whether defendant mistakenly believed plaintiff suffered from a disability. On the other hand, defendant asserts it always considered plaintiff capable of fulfilling her work responsibilities. In light of plaintiff's admission that she was capable and did indeed fulfill such responsibilities, it is difficult to envi-

sion how defendant mistakenly believed plaintiff was disabled. In any event, in the absence of proffered evidence, the court is persuaded plaintiff has not shown she was regarded as disabled.

In conclusion, plaintiff has failed to establish that she is disabled under the ADA's definition of disability. Without such a showing, the first element of plaintiff's prima facie case is lacking. Although this single failure will justify the imposition of summary judgment, the court will briefly discuss a second inadequacy in plaintiff's prima facie case.

### c. Element Two: Identified Vacant Position

■ A defendant-employer's duty to reassign a qualified employee is circumscribed by several limiting factors. Relevant to this element, the ADA neither requires a defendant-employer to create a new position within its company or bump another employee to make room for the qualified employee. *Smith*, 180 F.3d at 1174–75 (citing *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995)). Therefore, the position for which reassignment is sought must be both presently in existence and vacant.[6]

■ Plaintiff's papers to the court do not identify the position or positions within defendant's operation, which would be an appropriate accommodation to her "office work" only restriction.[7] Neither does plaintiff assert she requested reassignment to an appropriate position or attempted to enter into an interactive process to aid in identifying an appropriate position. In-

---

**6.** The vacant requirement is slightly modified, for "vacant" is defined as also including positions that while presently filled are reasonably anticipated by the defendant-employer to become vacant in the near future. *Smith*, 180 F.3d at 1175 (citing *Monette v. Electronic*

*Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir.1996)).

**7.** Granting plaintiff all reasonable inferences, the court assumes, without deciding, that Dr. Fullen's form does indeed limit plaintiff to "office work" only.

stead, the totality of plaintiff's argument on this issue consists of the following four sentences:

Plaintiff's undisputed facts show that plaintiff was restricted to office work, defendant knew of plaintiff's restriction, and refused to accommodate her restrictions. In fact, various managers completely ignored her restrictions.

The evidence shows that management claimed that it would check about [plaintiff]'s restrictions with her doctor. However, the evidence also shows that no one ever checked on such restrictions.

(Pl. Mem. in Opp'n at 76).

Plaintiff's failure denies the court the opportunity to discern whether the hypothetically identified jobs were in fact appropriate to her work restrictions so making them a reasonable accommodation, nor is the court able to consider whether these positions were even vacant. Therefore, the court also finds plaintiff has presented insufficient evidence to carry her burden as to the second element of her prima facie case. In light of the court's findings, summary judgment shall be granted on plaintiff's ADA discrimination claim.

## 2. Retaliation Claim

### a. Exhaustion of Administrative Remedies

Plaintiff alleges defendant unlawfully retaliated against her in response to plaintiff's requests for accommodation. Defendant argues it is entitled to summary judgment because plaintiff failed to properly exhaust her administrative remedies.

Similar to cases of discrimination brought pursuant to Title VII, exhaustion of administrative remedies is a jurisdictional prerequisite to bringing suit under the ADA. 42 U.S.C. § 12117(a). *See generally Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir. 1997) (considering analogous exhaustion under Title VII). To exhaust, a putative plaintiff must present his claim first to the EEOC as part of his timely filed EEOC "charge" for which he receives a right-to-sue letter. *Simms v. Oklahoma ex. rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999). The purpose of the exhaustion requirement is two-fold: to give notice of the alleged violation to the charged party and to give the EEOC an opportunity to conciliate the claim. *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir.1994).

In the case at bar, plaintiff's EEOC charge, filed on February 31, 1998, identified claims of "sex" and "disability" discrimination. (Arthun Aff. Ex. A). While there is a box available for "retaliation," plaintiff chose to leave it blank. While this is not dispositive, "it certainly creates a presumption that [she] was not asserting claims represented by boxes not checked." *Schroder v. Runyon*, No. 98–3128, 1998 WL 694518, at *2 (10th Cir. Oct.6, 1998) (internal citation and quotation marks omitted). The "particulars" section of plaintiff's charge is also devoid of any retaliation claim.[8]

---

8. The "particulars" section of the charge states:

I was falsely accused of driving a truck and hitting a line, then not reporting the incident. I did not hit the line and therefore could not report something I did not do. I believe this to be pretext for unlawful sex and disability discrimination.

I believe that I have been discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended, and because of my disability in violation of the Americans with Disabilities Act by being discharged.

Similarly situated, non-disabled male plant operators have been accused and admitted hitting a line with a truck and they were not discharged.

(Arthun Aff. Ex. A).

In response to this apparent lack of exhaustion, plaintiff offers the following two sentences: "Procedurally, defendant has not presented any admissible evidence, at summary judgment stage that indicates that plaintiff failed to exhaust administrative remedies. Certainly, the retaliation claim is a[sic] integral part of the case as evidenced by the Pretrial Order." (Pl. Mem. in Opp'n at 77). According to plaintiff's response to defendant's statement of uncontroverted facts, plaintiff's counsel believes the EEOC charge is inadmissible hearsay. (*Id.* at 13). The court summarily rejects this meritless position.

 Although plaintiff fails to assert the argument, the Tenth Circuit routinely recognizes an exception to the exhaustion rule. Even if a plaintiff fails to raise a claim to the EEOC, the additional claim may be included in the judicial complaint if the discrimination/retaliation is "reasonably related" to the allegations in the EEOC charge. *Simms,* 165 F.3d at 1327. The Tenth Circuit has held that when retaliation occurs after the filing of an EEOC charge, the subsequent retaliation is reasonably related to the previous charge. *Seymore,* 111 F.3d at 799. However, if the retaliation occurred prior to the filing of the charge and the employee did not include a retaliation claim in the filed charge, then the retaliatory act is ordinarily not reasonably related. *Id.* Plaintiff was terminated on November 13, 1997–approximately three months before she filed her charge of discrimination. Regardless of what action or actions plaintiff may attempt to construe as being taken in retaliation for her assertion of rights under the ADA, they conclusively occurred be-

fore her filing with the EEOC. Therefore, plaintiff's retaliation claim may not be considered reasonably related to her allegations included in the EEOC charge, and the court cannot excuse plaintiff's failure to include her retaliation claim in her EEOC charge.[9]

In sum, the court finds plaintiff failed to properly exhaust her administrative remedies in regards to her ADA retaliation claim, so the court is compelled to grant summary judgment as to this claim.

### B. Title VII Claims

#### 1. Sexual Harassment–Hostile Work Environment

 Plaintiff may establish actionable sexual harassment under Title VII if she demonstrates she was subjected to a hostile work environment so severe or pervasive that it constructively altered the terms or conditions of her employment. *See Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Penry v. Federal Home Loan Bank,* 155 F.3d 1257, 1261 (10th Cir.1998) (quoting *Davis v. United States Postal Serv.,* 142 F.3d 1334, 1341 (10th Cir.1998)). "While the plaintiff must make a showing that the environment was both objectively and subjectively hostile, she need not demonstrate psychological harm, nor is she required to show her work suffered as a result of the harassment." *Penry,* 155 F.3d at 1261 (citing *Davis,* 142 F.3d at 1341).

---

**9.** The Tenth Circuit has also identified a second possible exception to the exhaustion requirement. Consideration of claims "not expressly included in an EEOC charge is appropriate where the conduct alleged would fall within the scope of an EEOC investigation which would reasonably grow

out of the charges actually made." *Martin v. Nannie & the Newborns, Inc.,* 3 F.3d 1410, 1416 n. 7 (10th Cir.1993). Again, plaintiff fails to assert this exception, and the court summarily finds the exception inapplicable.

Title VII, however, does not provide redress for a working environment "merely tinged with offensive sexual connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The court is charged with the duty of filtering "out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Tenth Circuit has cautioned district courts that "the existence of sexual harassment must be determined 'in light of the record as a whole,' and the trier of fact must examine the totality of the circumstances, including 'the context in which the alleged incidents occurred.'" *Penry*, 155 F.3d at 1262 (quoting *Meritor*, 477 U.S. at 69, 106 S.Ct. 2399). Finally, a plaintiff must produce evidence that she was the object of harassment because of her gender. Conduct that is overtly sexual may be presumed to be motivated by a gender animus. *See id.* at 1261.

Defendant asserts summary judgment is appropriate on this claim because plaintiff has failed to allege sufficient facts demonstrating a hostile work environment. Plaintiff's rebuttal to defendant's position is embodied in the following single sentence: "In addition, women are subjected to derogatory comment, all of which also created a hostile work environment." (Pl. Mem. in Opp'n at 78). How plaintiff's counsel believes such sparse argument is adequate is simply beyond the court. In any event, after reviewing plaintiff's 382 paragraphs of uncontroverted facts and plaintiff's own deposition testimony, the court agrees with defendant and finds plaintiff has presented insufficient facts to sustain a claim of sexual harassment.

When asked in her deposition what acts of her coworkers substantiated her claim, plaintiff offered the following allegations: (1) Montoya used profanity in front of male and female coworkers, (Pl. Dep. at 93); (2) Montoya made sure plaintiff was busy every minute (*Id.* at 97); (3) Montoya's body language indicated he did not like working with plaintiff (*Id.* at 100); and (4) Wilder "wouldn't cross [Montoya] and he would go along," (*Id.* at 105). Without question these nonspecific allegations fall woefully short of creating a triable issue as to whether plaintiff endured a hostile work environment. "For a hostile environment claim to survive a summary judgment motion, 'a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Penry*, 155 F.3d at 1261 (quoting *Davis*, 142 F.3d at 1341).

Having found plaintiff's allegations insufficient, the court need not continue its analysis into defendant's liability. Summary judgment will, therefore, be granted on this claim.

### 2. Disparate Treatment/Discriminatory Discharge

Plaintiff next brings, pursuant to Title VII, a disparate treatment/discriminatory discharge claim against defendant. The Pretrial Order makes clear plaintiff is asserting she was terminated because of her gender.[10] The now familiar burden-

---

**10.** The Pretrial Order states: "As a direct result of defendant's unlawful employment practices and attitudes toward women, [plaintiff] was fired from her employment with defendant." (Pretrial Order at 6). Plaintiff's memorandum also echoes this argument: "In other words, [plaintiff] needs to show that defendant would not have fired her bot [sic] for the sex discrimination." (Pl. Mem. in Opp'n at 77).

shifting paradigm established in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), controls the court's analysis.[11] *See Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1315 (10th Cir.1999).

Under *McDonnell Douglas,* the plaintiff must first present a prima facie case of discrimination. Then, the burden of production shifts to the defendant to produce a legitimate, non-discriminatory justification for taking the action in question. Finally, the burden is redirected at the plaintiff to show the defendant's reason for its actions was merely a pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802–05, 93 S.Ct. 1817.

To establish a prima facie case of disparate treatment in this context, plaintiff must demonstrate: "(1) [s]he belongs to a protected class; (2)[s]he was qualified for her job; (3) despite [her] qualifications, [s]he was discharged; and (4) the job was not eliminated after [her] discharge." *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1229 (10th Cir.2000) (citing *Perry v. Woodward,* 199 F.3d 1126, 1138 (10th Cir.1999)).[12]

It is uncontroverted that plaintiff is female, she was discharged, and her job was not eliminated. A review of plaintiff's supervisor's deposition reveals plaintiff completed her job duties satisfactorily and was never disciplined. (Batchman Dep. at

11). Taken in conjunction with plaintiff's seven year tenure at Bushton, the court finds sufficient evidence demonstrating plaintiff's qualification to hold the plant operator position. Therefore, plaintiff has presented a prima facie case, and the burden now shifts to defendant to present a facially non-discriminatory justification for plaintiff's termination.

Defendant contends plaintiff was terminated because she failed to report a serious and life threatening accident to her superiors in violation of known company policy. The court finds this justification satisfies defendant's burden of production.

### a. Pretext

Plaintiff must now come forward with evidence sufficient to demonstrate defendant's justification is pretextual, for if a plaintiff "presents evidence that the defendant's proffered reason for the employment decision was pretextual-i.e., unworthy of belief, the plaintiff can withstand a summary judgment motion and is entitled to go to trial." *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). *See also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability) (construing the ADEA). "To establish pretext a plaintiff

---

**11.** The *McDonnell Douglas* analysis is generally employed when no direct evidence of discrimination is presented. Because both parties urge the court to consider the claim under *McDonnell Douglas,* the court adopts the analysis without deciding the circumstantial versus direct nature of plaintiff's proffered evidence.

**12.** In *Kendrick,* the Tenth Circuit acknowledged some of its earlier opinions had created a certain measure of confusion over the correct prima facie burden for disparate treatment/discriminatory discharge cases. *Ken-*

*drick,* 220 F.3d at 1228. Defendant filed its motion without the guidance of *Kendrick,* and not surprisingly, defendant has listed a now errant prima facie burden. The former prima facie burden required a plaintiff to show: (1) she is a member of a protected class; (2) she was discharged for violating a work rule; and (3) similarly situated non-protected employees who violated rules of comparable seriousness were treated differently. *See Wood v. City of Topeka,* 90 F.Supp.2d 1173, 1184 (D.Kan. 2000) (Saffels, J.) (considering discrimination charge prior to *Kendrick* ).

must show either that 'a discriminatory reason more likely motivated the employer or . . . that the employer's proffered explanation is unworthy of credence." ' *Bullington*, 186 F.3d at 1317 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (alteration in original). If a plaintiff chooses to demonstrate pretext by arguing the defendant's proffered justification is false, then she may accomplish this by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence . . . ." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997) (internal citation and quotation marks omitted).

Although once again hamstrung by extremely limited briefing, plaintiff appears to be forwarding two arguments in favor of pretext. First, plaintiff asserts defendant's justification is false, i.e., she did not cause the gas riser leak, and second, plaintiff argues that similarly-situated male employees were not discharged for comparable violations.

#### i. False Justification

■ Without question, plaintiff disputes defendant's position that she was responsible for the gas riser leak. Standing alone, however, this factual disagreement does not establish pretext.[13] *Kendrick*, 220 F.3d at 1230–31 (opining disagreement over factual occurrences facilitating termination are insufficient to establish pretext). Instead, "a challenge of pretext requires [the court] to look at the facts as they appear to the person

making the decision to terminate plaintiff." *Id.* at 1231. As long as the decision to terminate was grounded on the legitimate justification, the correctness, wiseness, or fairness of the decision is irrelevant. *See Bullington*, 186 F.3d at 1318 ("The relevant inquiry is not whether [defendant]'s proffered reasons were wise, fair or correct, but whether [defendant] honestly believed those reasons and acted in good faith upon those beliefs."); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir.1998) (finding plaintiff failed to establish pretext where the defendant discharged plaintiff after conducting an investigation into a subordinate employee's allegations of sexual misconduct on the part of plaintiff and believed them to be true, even though plaintiff presented evidence to the district court that the allegations may have been false); *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir.1993) ("Title VII is not violated by the exercise of erroneous or even illogical business judgment.").

■ Arguing that the gas riser incident justification is unworthy of belief, plaintiff offers the following:

> In this case, plaintiff has shown extreme contradictions in the statements of [plaintiff]'s accusers, improper motives and most importantly, evidence from the only individual with first hand knowledge of what caused the leak. That individual opined that the leak was caused by stress. The evidence also shows that defendant was not interested in his opinion. Therefore, there is substantial question about defendant's pretext for firing [plaintiff].

---

**13.** Plaintiff's counsel characterizes the issue as follows: "Since [plaintiff] did not hit the riser, the stated reason that she was fired isn't the real reason. The real reasons that [plaintiff] was fired is because she is a woman, she filed a workers' compensation claim and be-

cause of her limitations with her elbow injury." (Pl. Mem. in Opp'n ¶ 323). As will be shown, plaintiff's sole reliance on her subjective belief is inadequate to demonstrate pretext.

(Pl. Mem. in Opp'n at 74). The court rejects plaintiff's assertion. First, although plaintiff fails to identify who her "accusers" were, the court assumes this statement is in reference to her coworkers Montoya and Wilder. Even if one or both of these individuals acted with a discriminatory intent in fabricating plaintiff's participation in the accident, plaintiff has offered absolutely no evidence indicating those members of the management team responsible for making the decision to terminate her acted as a "rubber stamp" for their subordinate employees' prejudice. *See Kendrick,* 220 F.3d at 1231 (identifying how other circuits have held employer's liable if management acts as a conduit for an employee's prejudice). In fact, plaintiff's allegations regarding her coworkers' discriminatory beliefs are irrelevant when judging whether defendant acted upon a good-faith belief that plaintiff drove the pick-up truck into the gas riser. All the evidence before the court indicates defendant, acting through multiple investigations conducted by management-level employees, gathered information and made a decision. Plaintiff offers no evidence that the multiple investigations were a sham, or that they were conducted in collusion with individuals at Bushton harboring prejudice towards females. *See id.* (finding plaintiff failed to demonstrate pretext because no evidence existed calling the veracity of the employer's investigation into question).

Second, as to the allegation that pressure may have caused the leak, the court finds such a position pure speculation and irrelevant. The allegation again fails to impact or call into question the actions of defendant's managers responsible for making the crucial decision. In fact, as alluded to by plaintiff and confirmed in deposition testimony, no one on the investigation team was ever informed that one of Bushton's employees may have assumed the crack was caused by stress rather than an impact. (Wilkinson Dep. at 159). Therefore, even though plaintiff alleges she was not responsible for the gas riser accident, the court finds plaintiff has failed to demonstrate defendant's proffered justification was pretextual. *See Aramburu v. The Boeing Co.,* 112 F.3d 1398, 1408 n. 7 (10th Cir.1997) ("[S]ubjective belief of discrimination is not sufficient to preclude summary judgment.").

### ii. Disparate Treatment

 A plaintiff may attempt to show pretext by presenting evidence the defendant-employer acted contrary to established policy on a theory of disparate treatment, i.e., plaintiff "was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick,* 220 F.3d at 1232. "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'" *Id.* (quoting *Aramburu,* 112 F.3d at 1404).

Although strangely not referenced within the argument section of plaintiff's memorandum, within plaintiff's statement of uncontroverted facts there is mention of an incident involving a Bushton employee named Robert Mitchell ("Mitchell"). (Pl. Mem. in Opp'n ¶¶ 91, 252–54). According to the deposition testimony, Mitchell struck some equipment while driving a company truck. There is also some indication Mitchell may have failed to promptly report the accident, but it appears he received little to no disciplinary reprimand.[14] To the extent plaintiff is attempting to argue this incident represents disparate

---

14. Although unexplained by plaintiff, it would appear Mitchell's accident is the incident described by plaintiff in her EEOC charge. *See supra* note 8.

treatment, the court rejects such an assertion. First, there is absolutely no evidence describing Mitchell's position within defendant's operation. Without such evidence, the court is unable to determine whether Mitchell was a similarly situated employee. Second, there is absolutely no evidence regarding the egregiousness of Mitchell's supposed rule violation. Again, without such evidence the court is unable to determine whether Mitchell's accident was of comparable seriousness.[15] These evidentiary shortcomings compel the court to give the incident no weight in demonstrating disparate treatment for purposes of establishing pretext.

In sum, the court finds plaintiff has presented insufficient evidence demonstrating either the falsity of defendant's proffered justification or disparate treatment for work rule violations. Therefore, plaintiff has failed to carry her burden of establishing pretext, and the court will grant summary judgment on the plaintiff's disparate treatment/discriminatory discharge claim.

### C. State Law Claim

■ Having granted summary judgment on plaintiff's federal claims, the court declines to exercise supplemental jurisdiction over plaintiff's claim arising under state law. *See* 28 U.S.C. § 1367(c)(3) (granting district courts the discretion to dismiss state law claims once federal claims are dismissed). *See also United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("[I]f the federal claims are dismissed before trial, ... the state claims should be dismissed as well."); *Tonkovich v. Kansas Bd. of Regents,* 254 F.3d 941, 945 (10th Cir.2001); *Roe v. Cheyenne Mountain Conference Resort, Inc.,* 124 F.3d 1221, 1237 (10th Cir.1997). The parties do not

argue any unique circumstances, and the court finds none, that would justify exercising supplemental jurisdiction over plaintiff's state law claim against defendant.

### IV. CONCLUSION

As to plaintiff's ADA claims, the court finds plaintiff failed to present a prima facie case of discrimination, and the court finds plaintiff failed to properly exhaust her administrative remedies. Summary judgment will be granted on both ADA claims. As to plaintiff's Title VII claims, the court finds plaintiff failed to present evidence of a hostile work environment, and the court finds plaintiff failed to demonstrate defendant's justification for termination was pretextual. Summary judgment will be granted on both Title VII claims. Summary judgment will not be granted on plaintiff's state law claim. Instead, the claim will be dismissed without prejudice.

**IT IS THEREFORE BY THIS COURT ORDERED** that defendant's Motion for Summary Judgment (Doc. 87) is granted in part and denied in part, in accordance with the terms of this memorandum.

**IT IS FURTHER BY THIS COURT ORDERED** that plaintiff's state law claim is dismissed without prejudice.

**IT IS FURTHER BY THIS COURT ORDERED** that defendant's Motion for Determination of Place of Trial (Doc. 68) is denied as moot.

---

**15.** In deposition testimony, Mitchell's accident is described as "non-serious." (Wilkinson Dep. at 73).